ERNEST K. GANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ELEANOR GANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67113, 67129. Filed October 27, 1958.

*Bayley Kohlmeier, Esq.,* for the petitioners.
*Nat F. Richardson, Esq.,* for the respondent.

ARUNDELL, *Judge:* The respondent determined deficiencies in income tax for the taxable years ended December 31, 1953 and 1954, in amounts as follows:

| Petitioner | Docket No. | 1953 | 1954 |
| --- | --- | --- | --- |
| Ernest K. Gann | 67113 | $8,135.52 | $3,758.77 |
| Eleanor Gann | 67129 | 8,300.76 | 3,722.77 |

The issues raised by the pleadings are:

1. Whether the respondent erred in overstating petitioners' taxable income from the publication called "The High and the Mighty" for the year 1954 by the amount of $11,558.46;

2. Whether the respondent erred in overstating petitioners' taxable income from a publication called "Fiddler's Green" for the year 1954 by the amount of $562.50;

3. Whether the respondent erred in understating the medical deductions to which petitioners are entitled for the year 1954; and

4. Whether the respondent erred in denying petitioners the benefit of section 107 (b) of the Internal Revenue Code of 1939 in the determination of their tax liabilities for the year 1953.

### FINDINGS OF FACT.

Most of the facts are stipulated and are so found.

At all times pertinent hereto, petitioners Ernest K. Gann and Eleanor Gann were husband and wife and were domiciled in and residents of the State of California. All income earned or received by petitioners and each of them during the years involved herein was community property of petitioners and one-half of the income belonged to each of them. Petitioners' books and records are kept and their income tax returns are prepared on the cash receipts and disbursements basis.

For many years petitioner Ernest K. Gann, hereinafter sometimes referred to as Gann, has been engaged in the writing of novels and other literary works. Prior to 1949 Gann commenced work upon a novel which was published in 1953 under the title "The High and the Mighty." Gann continued to work on the novel for a period in excess of 36 months and completed work thereon during the year 1952.

On July 1, 1952, Gann entered into a written contract with William Sloane Associates, Inc., a corporation, hereinafter sometimes referred to as Sloane, for the publicatior. of the novel "The High and the Mighty." At the time the contract was executed, the novel was tentatively entitled "Return to the Stars" but it was published under the title "The High and the Mighty." Under the terms of the contract, Gann was to receive royalties based upon the sales of books. The publishers were required to submit semiannual statements of sales and all receipts from sales as of the 31st day of January and July, which statements were to be submitted to the author on May 25 and November 25, respectively. The publishers further agreed that as soon as possible after the close of each accounting period (January 31 and July 31) they would estimate the amounts which would be due on the accounting dates and would forward to the author at his request one-half of the amounts due and would pay the balance of any amounts due on the accounting dates (May 25 and November 25). The contract also provided for an advance payment of $5,000 payable during the year 1952.

The novel "The High and the Mighty" was first published and offered for sale during the year 1953.

On March 10, 1954, Gann entered into a written contract with Sloane for the publication and sale of another novel written by him entitled "Soldier of Fortune." During the negotiations for the publication of "Soldier of Fortune," Gann demanded a guaranteed income from the book in the amount of $2,000 a month for a period of 20 months. At that time Gann needed additional money for personal expenses and also for the purchase of a boat which he needed in order to secure experience and material for a new novel which he planned to write. The publishers considered the guaranteed payments demanded by Gann to be exorbitantly high but in order to keep him as an author the publishers finally agreed to the payments, which were made payable in 20 monthly installments, the first being on November 1, 1954, and the last on June 1, 1956.

The agreement for the guaranteed payments was incorporated in the contract for the publication of "Soldier of Fortune." As a condition to agreeing to the guaranteed payments, the publishers required that Gann agree that all royalties earned by him after January 31, 1954, on any other books written by him should be withheld until the earnings of "Soldier of Fortune" equaled the advance payments, or until July 31, 1958. At the time of the negotiations in March 1954, there was no way of knowing the amount of royalties which might be earned by either "The High and the Mighty" or "Soldier of Fortune." The provision for the withholding of royalties earned on other books was incorporated in the contract for the publication of "Soldier of Fortune" and read as follows:

TWELFTH: In consideration of the guarantee provided for under Fourth XI, the Author agrees that, until his actual earnings on the work exceed the guarantee, the Publisher shall withhold all earning accrued or accruing subsequent to January 31, 1954 on all other works by the Author. If by July 31, 1956 the earnings on SOLDIER OF FORTUNE are insufficient to cover the above guarantee, the withheld earnings from the Author's other works shall be applied against the guarantee, any unapplied balance being payable to the Author on the next regular accounting date. If, however, the earnings on SOLDIER OF FORTUNE exceed the guarantee prior to July 31, 1956, the earnings on the other works withheld by the Publisher shall be payable in full on the following regular accounting date.

During the year 1952, Gann received payments in a total amount of $5,000 from Sloane as advance payments against the earnings of "The High and the Mighty." The $5,000 was reported as taxable income in the joint income tax return filed by petitioners for the year 1952. During the year 1953 Gann received royalty payments in the total amount of $41,977.36 on the sales of "The High and the Mighty" from the date of publication thereof to and including July 31, 1953, which payments represented royalties earned during said period in the amount of $46,977.36, less the $5,000 advanced against the earnings during the year 1952. During the year 1953, Gann also received

$50,000 from Wayne-Fellows, Inc., for the motion picture and television rights to the novel "The High and the Mighty."

Royalties in the total amount of $16,021.50 were earned for Gann's account as the result of sales of "The High and the Mighty" during the period from August 1, 1953, to January 31, 1954. Royalties in the amount of $11,558.46 were earned for Gann's account as a result of the sales of "The High and the Mighty" during the period from February 1, 1954, to July 31, 1954. Of the sum of $11,558.46, $3,361.83 was earned as the result of sales as follows:

| Date | Source | Amount |
|---|---|---|
| Feb. 4, 1954 | British royalty | $468. 65 |
| Feb. 11, 1954 | Norwegian royalty | 202. 50 |
| Feb. 19, 1954 | Australian serial use | 315. 00 |
| Mar. 12, 1954 | French royalty | 389. 43 |
| Mar. 18, 1954 | Finnish advance | 135. 00 |
| Mar. 23, 1954 | Italian advance | 101. 25 |
| May 5, 1954 | Book of the Month Club, 10,000 at 0.175 | 1, 750. 00 |
| Total | | 3, 361. 83 |

On or about May 10, 1954, Gann requested Sloane to make immediate payment to him of all the money in his account. As the result of the request, Sloane delivered to Gann a check in the amount of $19,383.33 which included the following royalties:

| | |
|---|---|
| Royalties resulting from sales of "The High and the Mighty" during the period from August 1, 1953, to January 31, 1954 | $16, 021. 50 |
| Royalties resulting from sales of "The High and the Mighty" during the period from February 1, 1954, to May 5, 1954 | 3, 361. 83 |
| Total amount | 19, 383. 33 |

In connection with the closing of the books of account of Sloane as of July 31, 1954, it was discovered that $3,361.83 of the $19,383.33 paid to Gann in May 1954 was attributable to sales of "The High and the Mighty" and other income received from that book after January 31, 1954, and should have been retained by Sloane under the provisions of the contract for the publication of "Soldier of Fortune." By letter dated July 29, 1954, addressed to Gann, Sloane advised Gann that the payment made to him in May was in error and that he should have received only $16,021.50. He was further advised that since the immediate repayment of the $3,361.83, the portion paid in error, might embarrass him, Sloane would apply the overpayment against the guaranteed payments under the contract for "Soldier of Fortune" which would be due November 1 and December 1 of 1954. He was advised that he would not receive any payment under the guarantee in November 1954 and would receive only $638.17 in December. He was further advised that the $3,361.83 paid to him in error should be considered as part of the guarantee against "Soldier of Fortune" and should be considered earnings from that novel.

Thereafter, and during the year 1954, entries were made on the books of Sloane to restore the $3,361.83 to the account of Gann for royalties earned but unpaid from sales of "The High and the Mighty" and to apply that amount against the $40,000 guaranteed payments which were to be made under the "Soldier of Fortune" contract. This credit was applied against the payments totaling $4,000 which were due in November and December 1954, and the balance of the payments, namely, $638.17, was paid to Gann in December 1954.

Gann did not make it a practice to check or investigate the accounting reports which the publisher made to him but relied upon the publishers to make the proper payments. When he received the check for $19,383.33, he made no investigation to determine whether that was the correct amount which was owing to him. When he received the letter dated July 29, 1954, advising him that the $3,361.83 had been overpaid, he did not return the money to them because Sloane told him that he did not have to return it.

On or about December 1, 1954, Sloane paid to Gann the sum of $638.17 which represented the $4,000 which Sloane had agreed to advance to Gann during the months of November and December 1954 under the contract for the publication of "Soldier of Fortune," less the $3,361.83 which had been paid to Gann as a part of the payment of $19,383.33 in May 1954 in the manner described above. During the year 1954, sales of "Soldier of Fortune" produced royalties for Gann in the total amount of $1,680.89. Sloane's accounting records as of December 31, 1954, disclosed the sum of $2,319.11 to be owing to Sloane from Gann as the result of advances against royalties of "Soldier of Fortune."

Prior to 1953 Sloane had published another novel written by Gann under the title of "Fiddler's Green." During the year 1954, sales of "Fiddler's Green" produced royalties for Gann in the total amount of $562.50. No part of that sum was paid to Gann during the year 1954. The entire sum was retained by Sloane under authority of the provisions of paragraph Twelfth of the contract for the publication of "Soldier of Fortune."

In their income tax returns for the year 1953 petitioners reported the $41,977.36 received from Sloane during that year as royalties from "The High and the Mighty" and the $50,000 received from Wayne-Fellows, Inc., during that year. In their income tax returns for the year 1953 petitioners claimed the benefits of section 107 (b) of the Internal Revenue Code of 1939, and computed their tax liability in the amount which would have been payable if the income received from "The High and the Mighty" during the year 1953 had been received ratably over the 36 months preceding the close of the year 1953.

In their income tax returns for the year 1954, petitioners reported income from "The High and the Mighty" in the amount of $16,021.50,

reported income from "Soldier of Fortune" in the amount of $4,000, and did not report any income from "Fiddler's Green."

In determining the deficiencies here in controversy, respondent determined that petitioners constructively received as income for the year 1954 royalties in the amount of $11,558.48 (which amount includes $3,361.83 paid to Gann in error) earned from the sales of "The High and the Mighty" during the period from February 1, 1954, to July 31, 1954, and constructively received as income for the year 1954 the royalties earned by "Fiddler's Green" during the year 1954 in the amount of $562.50. The respondent did not eliminate from taxable income reported by petitioners any part of the $4,000 (which amount includes the $3,361.83, *supra*) reported by them as received for advances on "Soldier of Fortune."

On the basis of his determination that petitioners constructively received royalties from "The High and the Mighty" during the year 1954 in the amount of $11,558.46, respondent further determined that petitioners' gross income from "The High and the Mighty" during the year 1953 did not exceed 80 per cent of the total gross income from this novel during the year 1953, all prior years, and the year 1954. On the basis of that determination, the respondent refused to allow petitioners the benefits of section 107 (b) of the Internal Revenue Code of 1939.

### OPINION.

At the outset it should be noted that the respondent has twice included the amount of $3,361.83 in petitioners' income for 1954. The petitioners originally included that amount in the larger amount of $4,000 reported in their 1954 returns as advance royalties on the publication "Soldier of Fortune." The respondent in his determination of the deficiencies for 1954 started with the "net income as disclosed by return" and added thereto the amounts of $11,558.46 as royalties from "The High and the Mighty" and $562.50 as royalties from "Fiddler's Green." As set out in our Findings of Fact, the amount of $11,558.46 includes in petitioners' income for 1954 for the second time the amount of $3,361.83. As will appear later in this opinion, the amount of $3,361.83, aside from the matter of duplication, becomes important only in determining whether the amount represented royalty income from "Soldier of Fortune" or from "The High and the Mighty." As will also appear later, this becomes important in determining whether for the year 1953 petitioners are entitled to the benefit of section 107 (b) of the Internal Revenue Code of 1939.

Petitioners report their income and keep their books on the basis of cash receipts and disbursements. They did not receive in 1954 any part of the $8,196.63 ($11,558.46 minus $3,361.83) or any part of the $562.50 which the respondent determined should have been

reported by them in their 1954 returns as "constructively received."

The doctrine of constructive receipt has been applied in income tax cases for many years and was developed to prevent taxpayers from refusing to accept income which was actually available to them. In *Ross* v. *Commissioner*, 169 F. 2d 483 (C. A. 1, 1948), Circuit Judge Frankfurter, in referring to the doctrine, said:

The doctrine of constructive receipt treats as taxable income which is unqualifiedly subject to the demand of a taxpayer on the cash receipts and disbursements method of accounting, whether or not such income has actually been received in cash.  * * *

The doctrine of constructive receipt was, no doubt, conceived by the Treasury in order to prevent a taxpayer from choosing the year in which to return income merely by choosing the year in which to reduce it to possession. Thereby the Treasury may subject income to taxation when the only thing preventing its reduction to possession is the volition of the taxpayer.  * * *

Section 446 (a) of the Internal Revenue Code of 1954 provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446 (c) listed as a permissible method "the cash receipts and disbursements method." Section 451 (a) provided a general rule for inclusion as follows:

The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Regulations under section 451 were prescribed by T. D. 6282 (1958–1 C. B. 215). Section 1.451–2 of these regulations is captioned "Constructive Receipt of Income" and provides:

(a) *General rule.*—Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account or set apart for him so that he may draw upon it at any time. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.  * * *

We do not think the doctrine of constructive receipt can be so applied as to bring the above-mentioned amounts of $8,196.63 and $562.50 within petitioners' taxable income for the year 1954. These amounts were not unqualifiedly subject to the demand of petitioners who kept their books and reported their income upon the cash receipts and disbursements method. Under section Twelfth of the March 10, 1954, contract set out in our findings, petitioner Ernest K. Gann agreed that until his actual earnings on "Soldier of Fortune" exceed the guarantee of $40,000 "the Publisher shall withhold all earning accrued or accruing subsequent to January 31, 1954 on all other works by the Author." During the year 1954, the earnings on "Soldier of Fortune" amounted only to $1,680.89. Therefore, under the contract of March 10, 1954, petitioners did not have the free and unrestricted use of the

royalties on "The High and the Mighty" and "Fiddler's Green" that had accrued subsequent to January 31, 1954.

The respondent argues that petitioner Ernest K. Gann realized an immediate, tangible, measurable benefit from the withheld earnings because, by pledging them as security, he was given an otherwise impossibly large advance on a new book and that "[f]or this reason, respondent urges the Court to hold that petitioner constructively received the withheld earnings." He cites several United States Supreme Court decisions [1] for the general propositions that it is not necessary to receive cash in order to realize taxable income and that the assignment of income or the right to receive income may result in the taxation of the assigned income to the assignor. We do not think the cases cited by the respondent have any application to the present case. Petitioners in the instant case did not sell, assign, or give up their right to receive the royalties earned subsequent to January 31, 1954, by "The High and the Mighty" and "Fiddler's Green" or any part of them. They merely agreed to the postponement of the date of payment.

In *James F. Oates*, 18 T. C. 570 (1952), affd. (C. A. 7) 207 F. 2d 711, the taxpayers were for many years general agents for an insurance company. Upon their retirement as general agents they were entitled to receive certain commissions on renewal premiums. They had the right either to elect to receive these commissions in cash in the same years as they were paid to the company or to elect to amend their contracts and receive them in monthly installments of $1,000 over a period of not to exceed 180 months. An election when once made was irrevocable. They elected to amend their contracts and did so. In the taxable years there involved, the insurance company paid each of the two retired agents $1,000 per month although the renewal commissions amounted to considerably more than that amount. We held that the taxpayers in that case, being on the cash basis, were taxable only on the amounts which they actually received in each of the taxable years and were not taxable on the commissions credited to their accounts but which they did not receive and could not receive under their amended contract until some future year.

In the *Oates* case the respondent, in contending that the entire renewal commissions credited to the agents' accounts were taxable to the agents in the years so credited, relied largely on *Lucas* v. *Earl*, 281 U. S. 111 (1930) ; *Helvering* v. *Horst*, 311 U. S. 112 (1940) ; and *Helvering* v. *Eubank*, 311 U. S. 122 (1940). In holding those cases to have no application to the facts in the *Oates* case, we said:

---

[1] *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716 (1929) ; *Helvering* v. *Bruun*, 309 U. S. 461 (1940) ; *Helvering* v. *Horst*, 311 U. S. 112 (1940) ; *Helvering* v. *Eubank*, 311 U. S. 122 (1940) ; *Harrison* v. *Schaffner*, 312 U. S. 579 (1941) ; *Commissioner* v. *Smith*, 324 U. S. 177 (1945).

Those are cases where the income had been assigned to another and the taxpayer was contending that the assignment relieved him of taxation on the income and that the income was taxable to the one to whom it had been assigned. We have no such question here. Petitioners are making no contention that the commissions credited to their accounts by Northwestern in the taxable years will not be taxable to them if and when they receive them. Their contention is that under their amended contracts which were signed prior to their retirement they were not entitled to receive any more than they did in fact receive and that being on the cash basis they can only be taxed on these amounts and that the remainder will be taxed to them if and when received by them. * * *

For the reasons heretofore given, we hold that the above-mentioned amounts of $8,196.63 and $562.50 were not constructively received by petitioners during the year 1954 and that the respondent erred in including those amounts in petitioners' income for the year 1954. *Kay Kimbell*, 41 B. T. A. 940 (1940); *Howard Veit*, 8 T. C. 809 (1947); *James F. Oates, supra.*

In regard to the $3,361.83 which was paid to petitioner Ernest K. Gann by mistake, it is our opinion and we so hold that this must under the facts of this case be regarded as advance royalty on "Soldier of Fortune." It is true that between February 1, 1954, and May 5, 1954, "The High and the Mighty" had earned royalties in this amount. But, like the $8,196.63 and $562.50 discussed above, Gann, under the March 10, 1954, contract, had no right to receive those royalties until the royalties from "Soldier of Fortune" equaled the $40,000 to be advanced to Gann at the rate of $2,000 per month beginning November 1, 1954, for a period of 20 months. As soon as the mistake was discovered, Gann was advised by Sloane that the overpayment of $3,361.83 would be applied against the advance royalties from "Soldier of Fortune" due in November and December of 1954. We hold that the petitioners correctly returned this amount of $3,361.83 as royalties from "Soldier of Fortune" and that the respondent erred in again including it as royalties from "The High and the Mighty" in 1954 as a part of the larger amount of $11,558.46.

It follows from our holdings above that petitioners are entitled to the benefit of section 107 (b) of the Internal Revenue Code of 1939 [2]

[2] SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY.

(b) PATENT, COPYRIGHT, ETC.—For the purposes of this subsection, the term "artistic work or invention", in the case of an individual, means a literary, musical, or artistic composition of such individual or a patent or copyright covering an invention of or a literary, musical, or artistic composition of such individual, the work on which by such individual covered a period of thirty-six calendar months or more from the beginning to the completion of such composition or invention. If, in the taxable year, the gross income of any individual from a particular artistic work or invention by him is not less than 80 per centum of the gross income in respect of such artistic work or invention in the taxable year plus the gross income therefrom in previous taxable years and the twelve months immediately succeeding the close of the taxable year, the tax attributable to the part of such gross income of the taxable year * * * shall not be greater than the aggregate of the taxes attributable to such part had it been received ratably over that part of the period preceding the close of the taxable year but not more than thirty-six calendar months.

in the determination of their tax liabilities for the year 1953. Petitioners' gross income in 1953 from "The High and the Mighty" was $91,977.36 ($41,977.36 royalties and $50,000 for motion picture and television rights). This amount of $91,977.36 was more than "80 per centum of the gross income in respect of such artistic work or invention in the taxable year [$91,977.36] plus the gross income therefrom in previous taxable years [$5,000] and the twelve months immediately succeeding the close of the taxable year [$16,021.50]." The amount of this benefit, together with the amount of the deduction in 1954 for medical expenses, will be determined in the computations to be made under Rule 50.

*Decisions will be entered under Rule 50.*