WILLIAM B. LEAVENS, JR., AND EMELINE P. LEAVENS, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 791–63, 964–63, 1189–63, 2103–63. Filed July 23, 1965.

*Isadore Glauberman* and *Alfred B. Freedman*, for the petitioners. *Laurence Goldfein*, for the respondent.

TRAIN, *Judge:* Respondent determined the following deficiencies and additions to tax in petitioners' income taxes for the years in issue:

---

[1] Proceedings of the following petitioners are consolidated herewith: Robert Glass and Mae C. Glass, docket No. 964–63; and John Last and Marie Last, docket No. 1189–63.

| | Year | Docket No. | Deficiency | Additions to tax under sec. 6651(a) I.R.C. 1954 |
|---|---|---|---|---|
| William B. and Emeline Leavens, Jr_____ | 1956 | 2103-63 | $18,007.95 | |
| | 1957 | 791-63 | 23,469.63 | |
| | 1958 | 791-63 | 27,011.67 | |
| | 1959 | 791-63 | 45,817.09 | |
| Robert C. and Mae C. Glass_____ | 1956 | 964-63 | 10,286.93 | |
| | 1957 | 964-63 | 13,348.04 | |
| | 1958 | 964-63 | 15,713.89 | |
| | 1959 | 964-63 | 28,002.67 | |
| John and Marie Last_____ | 1956 | 1189-63 | 5,690.77 | $551.15 |
| | 1957 | 1189-63 | 6,968.60 | 277.80 |
| | 1958 | 1189-63 | 7,148.32 | |
| | 1959 | 1189-63 | 19,191.31 | 2,956.07 |

The deficiencies result from respondent's inclusion in petitioners' incomes of certain amounts which were credited to them under the terms of a profit-sharing trust in which they participated. We must decide whether these amounts were "made available" to petitioners within the meaning of section 402(a)(1) of the Internal Revenue Code of 1954. Secondly, we must decide whether the petitioners in docket No. 1189-63 are liable for the additions to tax asserted under section 6651(a).

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioners William B. and Emeline P. Leavens, Jr., Robert and Mae C. Glass, and John and Marie Last are husband and wife, respectively. All of the petitioners are cash basis taxpayers who filed their joint Federal income tax returns for the years 1956, 1957, 1958, and 1959 with the district director of internal revenue at Newark, N.J. Since the wives are parties only because each filed joint income tax returns with her husband for the years in issue, only the husbands shall be referred to hereinafter as petitioners.

Petitioners are, and have been at all relevant times, officers and employees of the Wilkata Folding Box Co. (hereinafter sometimes referred to as Wilkata). During the years 1955 through 1959, they occupied the following positions: William B. Leavens, Jr., president; Robert Glass, treasurer; John Last, secretary.

By a trust indenture dated July 24, 1950, Wilkata established an employees' profit-sharing trust. The trust instrument expressly provided that it was intended to qualify as a tax-free profit-sharing trust under the Internal Revenue Code. By a letter ruling dated October 26, 1950, Wilkata was advised that the trust met the require-

ments of section 165 (a) of the Internal Revenue Code of 1939 and was thus entitled to the exemption provided by that statute.

Article II, paragraph 1, of the trust agreement provides in part that every regular employee of Wilkata who, on the first day of August of any year, beginning with 1950, has been an employee continuously for at least 5 years ending on that date, and who has attained the age of 30 years, is entitled to participate in the plan for such year. The year 1950 was the first year of the trust and contributions were made by Wilkata in that year based on Wilkata's profits for the year. From the inception of the trust, and up to the present time, petitioners have been particpants in the plan. At all times the records of the trust have been maintained, and the affairs of the trust conducted, in the manner prescribed by the trust agreement.

The Wilkata employees participate in the benefits of the plan pro rata in accordance with their salary, as defined by the trust agreement, for the year in question. If the net profits of Wilkata, as defined in the trust agreement, are less than $30,000, Wilkata is not obliged to make any payments under the plan; if the net profits exceed $30,000, then Wilkata pays 10 percent of the next $30,000, 20 percent of the following $30,000, 30 percent of the next $30,000, 40 percent of the next $30,000, and 50 percent of the net profits over $150,000. In the event that Wilkata suffers a net loss in any year, it is entitled to recoup the loss out of the profits of future years before making any additional payments to the trust corpus.

By article VII, paragraph 1, of the trust agreement, Wilkata reserved the right, at any time by action of its board of directors, to modify or amend the trust agreement in whole or in part either retrospectively or prospectively. Such amendments are valid when there is delivered to the trustee a certified copy of a resolution of the board of directors authorizing such modification. The trust provides, however, that Wilkata has no right to amend the agreement in such manner as would permit a diversion of the trust corpus for any purpose other than the exclusive benefit of the employees, or which would permit a reversion of trust assets to Wilkata. No amendments have ever been made to the trust.

The trust agreement further provides that the trustee can segregate or invest separately any share of any participant in the trust fund. Colin Campbell Ives (hereinafter sometimes referred to as Ives) has been the sole trustee of the trust from its inception until the present time. Ives has always held and administered the trust res as a single trust, except for the purchase of certain insurance and annuity policies for particular participants. He has not segregated or separately invested the remaining pro rata portion or credit of any participant in the trust.

Sometime in March or April of each year, Ives sends a letter to each of the participants stating the then-present interest of that participant in the assets of the trust. The letter reflects the total amount of the fund assets credited to the participant and the extent of retirement income and other insurance taken out for the benefit of such participant.

Under article VI, paragraph 2(a)(1), of the trust indenture, after the completion of 5 years' participation, each participant has the following distribution option:

2. *Distributions of Benefits*

(a) *Distribution during participant's continued employment.*

(1) The Trustee shall, on written request of participant, after participant has completed five years' participation in the Plan, distribute to him within five days after such request a sum in cash equal to a one-fifth part of the amount then standing to his credit in the Trust and the balance left in such participant's account shall, on his request, be paid to him thereafter by the Trustee in four annual installments which shall be equal to each other so far as variations in the value of the Trust Fund and the addition of income thereto, as aforesaid, shall permit.

In 1954, because of the publication of a revenue ruling, Ives became concerned that the participants in the trust might suffer adverse tax effects as a result of the distribution option set out above. He communicated his concern to petitioners. Prior to July 1955, Ives suggested to the employees that the plan be amended to eliminate this provision from the trust indenture. However, a few of the participants refused to go along with his proposal. He thereupon advised petitioners that unless participants whose interests represented at least two-thirds of the trust fund would agree to waive their withdrawal privileges under article VI, paragraph 2(a)(1), he would be unable to continue to invest trust funds in common stocks and insurance as successfully as he had in the past.

Because of the unusual success Ives had achieved in his investment program with the trust funds, petitioners were anxious to have him continue it as long as he believed it was feasible to do so. Consequently, on various dates from July 6, 1955, to approximately July 20, 1955, seven participants in the trust, including petitioners, signed the following agreement:

In order to enable the Trustee to continue his long range investment program, we, the undersigned, waive until January 1, 1957 our respective rights, as set forth in Subdivision #1 in Paragraph #2 of Article VI of the Profit Sharing Plan to receive a one-fifth ($\frac{1}{5}$) part of the amount standing to our credit in the Profit Sharing Plan and agree not to request the Trustee to make any payments to us prior to said date.

The combined interest of the participants in the trust who signed the agreement above was approximately two-thirds of the total cash and securities fund during each of the years 1955 through 1960.

Ives had the signatories agree to postpone their distribution option only until January 1, 1957, because he believed that the employees who had not wanted to have the plan amended in 1955 might be willing to do so in 1956, after they had received their first cash withdrawals from the trust. During 1956, Ives again attempted to have the trust agreement amended by deleting the withdrawal provisions of article VI, paragraph 2(a) (1), but was unable to obtain the unanimous consent of the participants. He then prepared a second waiver agreement postponing the withdrawal option for a 5-year term. This agreement was executed by petitioners and three other participants in the trust on December 19, 1956. It reads as follows:

WE, the undersigned, in order to enable the Trustee under the Profit Sharing Plan dated July 24, 1950 of WILKATA FOLDING BOX COMPANY, to continue his long range investment program, have heretofore signed a waiver until January 1, 1957 of our respective rights as set forth in sub-division 1 of paragraph (2) of ARTICLE VI. of said Profit Sharing Plan to receive a one-fifth part of the amount standing to our credit in said Profit Sharing Plan and have agreed not to request the Trustee to make any payment to us prior to said date.

In order to enable the Trustee to continue the investment program which has turned out to be very satisfactory to us; the undersigned again waive said rights until January 1, 1962, and agree not to request the Trustee to make any payments to us prior to said date under said sub-division 1 of paragraph (2) of ARTICLE VI. of said Profit Sharing Plan. Dated, Kearny, New Jersey. December 19, 1956.

In the summer of 1960, John Last, one of the signatories of the waiver agreements, and a petitioner in this case, demanded a distribution of trust assets from Ives. Ives refused Last's demand and filed suit in the Superior Court of New Jersey, Chancery Division, seeking instructions and a determination as to the validity of the postponement agreement. After the trial, the court held that the signatories of the December 19, 1956, agreement were bound by its terms and could not, prior to January 1, 1962, demand distribution from the trustee pursuant to article VI, paragraph 2(a) (1), of the trust agreement. The trustee was instructed by the court that Last and the other signatories had no legal right to receive any moneys or other distributions pursuant to article VI, paragraph 2(a) (1), prior to January 1, 1962. On November 17, 1961, the Superior Court of New Jersey, Appellate Division, affirmed per curiam the judgment of the lower court.

During the entire period 1955 through 1960 the stock of Wilkata was owned as follows:

| | |
|---|---:|
| William B. Leavens, Jr | 265 |
| William B. Leavens, Jr. (as trustee) | 84 |
| John M. Leavens (brother of petitioner Leavens) | 22 |
| Robert Glass | 100 |
| John Last | 100 |
| William Bock | 100 |
| Walter McDonough | 100 |
| Colin Campbell Ives (as trustee) | 400 |
| Colin Campbell Ives (individually) | 1 |
| Others | 149 |
| Total | 1,321 |

Petitioners did not receive any distributions from the trust during the years 1956 through 1961, the period covered by the two agreements they entered. However, other participants in the trust, who did not sign the agreements set out above, requested and received distributions from the trust under the distribution provisions of article VI, paragraph 2(a)(1).

### OPINION

The issue before us is a very narrow one. We must decide whether on the facts presented, the petitioners' respective shares in Wilkata's profit-sharing trust were "made available" to them within the meaning of section 402(a)(1) of the Internal Revenue Code of 1954.[2] Petitioners contend that by reason of their written agreements to postpone their options to receive distributions from the trust, which were determined valid by the New Jersey courts, no income was made available to them within the meaning of section 402(a)(1). Respondent contends that the agreements do not alter the trust agreement in any way, that consequently nothing prevents amounts being made available to petitioners under article VI, paragraph 2(a)(1), of the trust, and that the New Jersey decisions are not binding on this Court. We agree with respondent.

The conclusiveness of State court determinations involving "specific proprietary interests" and the resulting imposition of Federal taxes on the party who was determined to have the proprietary interest has long been recognized. *Freuler* v. *Helvering*, 291 U.S. 35, 39 (1934); *Blair* v. *Commissioner*, 300 U.S. 5 (1937); *Gallagher* v. *Smith*, 223 F. 2d 218 (C.A. 3, 1955). However, the agreements involved here, as construed in the New Jersey decisions, do not decide the petitioners' property rights. Title to the funds in the profit-

---

[2] SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST.

  (a) TAXABILITY OF BENEFICIARY OF EXEMPT TRUST.—

    (1) GENERAL RULE.—Except as provided in paragraph (2), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities) except that section 72(e)(3) shall not apply. * * *

sharing trust is not the issue here (petitioners do not contend that they ever gave up their title in their pro rata shares of the trust res) ; rather, we must decide when and if these funds were "made available" for distribution and, thus, includable in petitioners' income for Federal tax purposes. The statutory phrase relates to the point in time when a taxpayer must include his portion of a trust res in income. The State court decrees merely stand for the proposition that the contracts entered into by the petitioners to delay withdrawal from the trust are supported by valid consideration and are enforceable.

Petitioners' contention concerning the conclusiveness of the State court decisions as to the availability for distribution of the trust funds falls before the rule laid down in *Burnet* v. *Harmel*, 287 U.S. 103 (1932), at page 110:

Here we are concerned only with the meaning and application of a statute enacted by Congress, in the exercise of its plenary power under the Constitution, to tax income. The exertion of that power is not subject to state control. It is the will of Congress which controls, the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nationwide scheme of taxation. * * *

There is nothing in the language of section 402 or its legislative history which would indicate that Congress intended to make the phrase "made available" rest upon the separate laws of the various States. Moreover, a close reading of the oral opinion rendered by the Chancery Division of the Superior Court of New Jersey (Feb. 28, 1961), affirmed per curiam by the Appellate Division of the Superior Court of New Jersey (Nov. 17, 1961), belies petitioners' argument that the State court decision is determinative of, or even intended to determine, the availability of the trust funds to petitioners. The courts merely decided that petitioners, between themselves, had mutually contracted away their rights to demand a distribution of funds from the trustee. On page 11 of its opinion, the court stated as follows:

For the reasons above stated it is the judgment of this court that the defendant Last has no right to demand distribution of his respective share during the life of the waiver agreement of December 19, 1956 and the trustee is instructed that the *participants* to such agreement *have no legal right to distribution* until January 1, 1962. [Emphasis supplied.]

It is true that the final judgment entered under the above decision instructed the trustee not to pay any sums to petitioners and petitioners not to demand distribution. Though these instructions may have had the same ultimate financial effect with respect to petitioners as if the trust had been amended, nevertheless the New Jersey courts did not purport to amend the trust and, in fact, the trust never was amended. Section 402(a)(1) taxes "the amount actually distributed or made available to any distributee by any employees' trust." This language

clearly indicates to us that the results of the application of the section depends on when the *trust* makes amounts "available." Thus we find nothing contradictory in the New Jersey court's finding that petitioners had validly contracted away their rights to demand distribution from the trust for a period of years and our finding that the funds were "made available" to petitioners within the intendment of section 402(a)(1).

Having determined that the New Jersey decrees do not bind us, we turn to the question of whether petitioners' mutual agreements not to withdraw, although binding upon each of them, can operate to alter the trust agreement so as to make its expressly stated withdrawal provisions inoperable as to petitioners for Federal income tax purposes, as a matter of law.

It is important to our analysis to note that the trust agreement has never been amended to cancel or modify the withdrawal provisions of the trust. Ives testified that for sometime prior to the execution of the two waiver agreements he attempted to join all the trust participants together to amend the trust, but that he was unable to do so because of a desire on the part of some to exercise their withdrawal rights under article VI, paragraph 2(a)(1). Having failed to amend the trust and delete the withdrawal provisions, Ives suggested the waiver agreements ultimately entered into by petitioners.

During the years in issue, other participants in the Wilkata plan have requested and received payments under article VI, paragraph 2(a)(1). To honor the private agreements of petitioners under these facts would have the anomalous result of construing the language of article VI, paragraph 2(a)(1), to make funds available to those participants who asked for them but not available to those who did not ask for them, thus allowing petitioners to supersede the trust agreement by their individual waivers. The phrase "made available," as used in section 402, pertains to the right of withdrawal under the terms of the trust and is not to be determined by the personal desires of some of the individual participants therein.

It goes without saying that a participant, or a group of participants, in Wilkata's plan could not decline to withdraw funds available to him under article VI, paragraph 2(a)(1), and subsequently exclude them from income because they were not "made available," even if done in advance of the payment date. The funds withdrawn under article VI, paragraph 2(a)(1), were payable on demand, and it is contradictory to suggest that because they were not demanded they were not "made available." Yet this is very much what petitioners' argument proposes. They ask us to reject the trust provisions, which they were not able to amend, in favor of their private agreements over which they have complete control. It was possible, throughout the period covered by the two waiver agreements, for the petitioners,

as a group, to rescind their waivers at any time and withdraw their respective shares. Nothing in the trust agreement and no power given the trustee could prevent them from doing so.

Petitioners rely on Rev. Rul. 55–423, 1955–1 C.B. 41, and Rev. Rul. 55–425, 1955–1 C.B. 43, as authority for their position. But both rulings dealt with trust agreements which specifically provided for an irrevocable waiver election as to whether funds would be paid to the beneficiary. These facts alone are sufficient to distinguish these rulings from the present case. However, we note that these rulings make very clear that the term "made available" depends entirely on the language contained within the four corners of the trust instrument. Although Rev. Rul. 57–260, 1957–1 C.B. 164, also cited by petitioners, does not mention whether the waiver option was provided for in the plan, the existence of an irrevocable election strongly suggests such a provision.[3]

The decision in *Estate of A. M. Berry*, 44 B.T.A. 1254 (1941), cited by petitioners as controlling the outcome of this case, is distinguishable. In *Berry* we dealt with a situation where complete withdrawal from the plan precluded any future participation therein. We have long held that such a limitation or condition upon withdrawal is so important that the amounts credited to the participants are not thereby "made available" to them. *Dillis C. Knapp*, 41 B.T.A. 23 (1940). The facts before us show that Wilkata's profit-sharing trust agreement had none of the limitations that were present in *Knapp* and *Berry*, and thus these cases do not control our decision here.

We agree with the petitioners that section 402 was intended to delay includability in income until the participant in a profit-sharing trust has a right to receive his share under the provisions of the trust agreement. It may also be true that the trust agreement in issue here could have been originally written or subsequently amended to provide for the type of waiver attempted by the petitioners. However, we find that the clear and unmistakable language of the trust agreement made the trust funds available to the petitioners during the years in issue and that the waivers signed by petitioners, who were not the entire group of participants in the trust, could not and did not alter the trust agreement in any way. Petitioners' personal mutual agreements not to accept the money cannot alter the fact that, by law, it was "made available" to them. The plain meaning and intent of section 402 cannot be avoided by the simple expedient of mutually advantageous waivers, executed by some of the participants

---

[3] Cf. Meyer, "Tax Aspects of Distributions from Qualified and Non-qualified Plans," 1959 So. Calif. Tax Inst. 811, 822 ; and Goodman, "Constructive Receipt under Pension & Profit Sharing Plans," speech before Western Pension Conference, C.C.H. Pension Plan Guide par. 27,506, p. 19,182, P.–H. Pension and Profit Sharing par. 19,022.4, p. 19,316, where this revenue ruling is cited for the proposition that the waiver must be made pursuant to the terms of the plan.

who wish to delay including in their income funds unconditionally available to them under the express terms of a trust. In effect, petitioners exercised authority over the funds that were made available to them by the trust and recontributed those funds to the trustee for continued investment.

It is true that during the taxable years in question petitioners never actually received any of the amounts which were allocated to them under article VI, paragraph 2(a)(1), and yet our decision herein requires petitioners to pay tax on these amounts. However, to decide in favor of petitioners would permit one or more profit-sharing trust beneficiaries to waive payments of benefits until they chose to receive them, so long as the waiver was executed before the benefits became payable. The trust instrument vests certain rights to receive payments in the beneficiaries, and to permit unilateral waivers of these rights, without a modification of the trust instrument, would give an employee an option not contemplated by the Code, to wit, to postpone taxation to some time subsequent to the funds becoming available. Where the trust instrument vests a beneficiary with the right to receive benefits, a collateral waiver or postponement by him of the benefits, for a valid business reason or for personal tax advantage, does not make the funds any less "available" to him for Federal income tax purposes.

Although the petitioners in docket No. 1189–63 allege error with respect to the additions to tax under section 6651(a), they have presented no evidence on this issue. Since respondent's determination is presumptively correct, and since the petitioners have not carried their burden of proof, we hold for the respondent. The additions to tax are sustained.

*Decisions will be entered for the respondent.*