William B. LEAVENS, Jr. and Emeline P. Leavens, Appellants in No. 71–1675.

v.

COMMISSIONER OF INTERNAL REVENUE.

Robert GLASS and Mae C. Glass, Appellants in No. 71–1677,

v.

COMMISSIONER OF INTERNAL REVENUE.

John LAST and Marie Last, Appellants in No. 71–1678,

v.

COMMISSIONER OF INTERNAL REVENUE.

Nos. 71–1675, 71–1677 and 71–1678.

United States Court of Appeals, Third Circuit.

Argued June 8, 1972.

Decided Sept. 22, 1972.

Herbert L. Zuckerman, Newark, N. J., for appellants.

Ann E. Belanger, Dept. of Justice, Tax Div., Washington, D. C. (Meyer Rothwacks, Paul M. Ginsburg, Attys., Tax Div., Dept. of Justice, Washington, D. C., Fred B. Ugast, Acting Asst. Atty. Gen., on the brief), for appellee.

Before HASTIE, GIBBONS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

The sole question in this case is whether money set aside for the appellants under an employees' qualified profit-sharing plan was made available to them, and therefore taxable, during the period from 1956–59.

Appellants had signed multilateral agreements prohibiting each other from withdrawing any funds for a period of several years. They contend that although the private agreements were not executed by all of the participants in the

plan, the agreements significantly restrained the signatories' right to the funds so as not to make them available, or constructively received, under Section 402(a)(1) of the Internal Revenue Code, 26 U.S.C. Section 402(a)(1), during the years in which the agreement was in effect. The Commissioner argues that the funds were made available because the trust agreement, which had not been amended to incorporate the terms of the private agreements, permitted the withdrawal of the funds without substantial limitation. The Tax Court, 44 T.C. 623, agreed with the Commissioner. We disagree and reverse.

All of the taxpayers in this case are either officers of the Wilkata Folding Box Company or their wives.[1] On July 24, 1950, Wilkata established a profit-sharing trust for its employees. The plan, which qualified for special tax-exempt status under then Section 165 of the Internal Revenue Code,[2] provided that anyone who was thirty years of age and had worked for the company for five years was entitled to participate.

The feature of the plan at the root of this litigation is Article VI, paragraph 2(a)(1), which stated that after five years participation in the plan a participant had the following distribution option:

2. Distributions of Benefits

(a) Distribution during participant's continued employment

(1) The Trustee shall, on written request of participant, after participant has completed five years' participation in the Plan, distribute to him within five days after such request a sum in cash equal to a one-fifth part of the amount then standing to his credit in the Trust and the balance left in such participant's account shall, on his request, be paid to him thereafter by the Trustee in four annual install-

ments which shall be equal to each other so far as variations in the value of the Trust Fund and the addition of income thereto, as aforesaid, shall permit.

Because of the Board of Tax Appeals decision in Estate of Berry, 44 B.T.A. 1254 (1941), the trustee of the plan believed that the participants would not be taxed on their shares of the fund until such time as they actually sought to withdraw their moneys. However, in 1954 and 1955, before the money was to become available for withdrawal on January 1, 1956, the Internal Revenue Service issued Revenue Rulings 54–265, 55–423 and 55–425. Collectively, these rulings cast doubt upon whether taxpayers would be able to avoid recognition of income from the money in the trust until they wished to withdraw it.

Ives, the trustee, proposed to participants in the plan that they amend the indenture to eliminate the questionable provision. To bolster his argument, he further contended that his successful investment program would have to be curtailed unless he could be assured that he would have at least two-thirds of the plan's funds for continued operation. This two-pronged approach convinced some, but not all, of the employee participants. Consequently, seven employees, including all of the appellants in this case, on various dates from July 6, 1955, to July 20, 1955, signed an agreement which stated:

In order to enable the Trustee to continue his long range investment program, we, the undersigned, waive until January 1, 1957 our respective rights, as set forth in Subdivision #1 in Paragraph #2 of Article VI of the Profit Sharing Plan to receive a one-fifth ($\frac{1}{5}$) part of the amount standing to our credit in the Profit Sharing Plan and agree not to request

---

1. Emeline P. Leavens, Mae C. Glass and Marie Last are parties to this litigation only because each filed a joint income tax return with her husband.

2. The provisions of Section 165 of the Internal Revenue Code of 1939 are generally carried over in Section 401 of the Internal Revenue Code of 1954, 26 U.S.C. § 401, as amended.

the Trustee to make any payments to us prior to said date.

During 1956 Ives made further efforts to have the trust agreement amended. Again some of the participants looked forward to withdrawing their shares in the near future and would not go along. He then drafted a second waiver agreement delaying withdrawal rights for five years. The appellants and three other participants signed the agreement, which provided:

We, the undersigned, in order to enable the Trustee under the Profit Sharing Plan dated July 24, 1950 of WILKATA FOLDING BOX COMPANY, to continue his long range investment .program, have heretofore signed a waiver until January 1, 1957 of our respective rights as set forth in sub-division 1 of paragraph (2) of Article VI of said Profit Sharing Plan to receive a one-fifth part of the amount standing to our credit in said Profit Sharing Plan and have agreed not to request the Trustee to make any payment to us prior to said date.

In order to enable the Trustee to continue the investment program which has turned out to be very satisfactory to us; the undersigned again waive said rights until January 1, 1962, and agree not to request the Trustee to make any payments to us prior to said date under said sub-division 1 of paragraph (2) of ARTICLE VI of said Profit Sharing Plan. Dated, Kearney, New Jersey, December 19, 1956.

In 1960, John Last, one of the signatories of the second agreement and an appellant here, demanded of Trustee Ives distribution of his share of the assets. Ives refused, and Last filed suit in the state court, seeking instructions and a determination of the validity of the postponement agreement. The New Jersey Chancery Court held the agreement valid and found that the signatories could not demand distribution prior to January 1, 1962. The Superior Court of New Jersey, Appellate Division, affirmed.

Although these particular participants were barred from making withdrawals from the fund, other employees of Wilkata not parties to the postponement agreement did exercise their withdrawal rights.

The Commissioner determined that the agreements could not alter the tax consequences of the trust provisions and that appellants' various shares in the fund were made available to them as of January 1, 1956. He then determined liability over the following three years, based on a withdrawal of the designated one-fifth amount permissible under Article VI, paragraph 2(a)(1).[3]

3. The Commissioner determined the following amounts were owed by appellants:

| | Year | Deficiency | Additions to tax under Sec. 6651(a) I.R.C. 1954 |
|---|---|---|---|
| William B. and Emeline Leavens, Jr. | 1956 | $18,007.95 | ........ |
| | 1957 | 23,468.63 | ........ |
| | 1958 | 27,011.67 | ........ |
| | 1959 | 45,817.09 | ........ |
| Robert C. and Mae C. Glass | 1956 | 10,286.93 | ........ |
| | 1957 | 13,348.04 | ........ |
| | 1958 | 15,713.89 | ........ |
| | 1959 | 28,002.67 | ........ |
| John and Marie Last | 1956 | 5,690.77 | $ 551.15 |
| | 1957 | 6,968.60 | 277.80 |
| | 1958 | 7,148.32 | ........ |
| | 1959 | 19,191.31 | 2,956.07 |

The Tax Court[4] stated that, in determining whether the funds were made available in the years in question within the contemplation of Section 402(a)(1), it would look only to the terms of the trust indenture itself to see if it placed any impediment on appellants' withdrawal rights. In so doing, it held that the state court decision construing the waiver agreement was irrelevant. The Tax Court dealt only with the right to distribution of the property and not with its actual ownership. It reasoned that ownership, and consequently constructive receipt, were determined solely on the basis of the provisions of the trust indenture. It distinguished the *Berry* case, on which appellants had relied when drawing up the plan, finding that severe economic consequences facing Berry were a sufficient limitation on total withdrawal to make the funds not available. The court said no such limitations existed in this case. To bolster its argument, it argued that to permit private agreements to vary tax consequences would give taxpayers an option not contemplated or permitted by the Code.

■ We cannot agree with the Tax Court's concept of when funds were made available to appellants. "Made available" under Section 402(a)(1)[5] is analogous in tax law to the concept of "constructive receipt." Rev.Rul. 58–230, Treas.Reg. § 1.451–2. Generally, a cash basis taxpayer recognizes income only when he actually receives the funds. However, the principle of "constructive receipt" has developed to deal with situations in which the income is subject to the taxpayer's control without substantial restriction even though he does not seek to take actual possession of it. United States v. Pfister, 205 F.2d 538, 540–541 (8th Cir. 1953); Weil v. Commissioner of Internal Revenue, 173 F.2d 805, 806 (2d Cir. 1949); Nannie Carr Harris, 56 T.C. No. 89 (1971). So long as the "income . . . is subject to a man's unfettered command and . . . he is free to enjoy [it] at his own option [, it] may be taxed to him as income, whether he sees fit to enjoy it or not." Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916 (1930). *See* Rabkin and Johnson, Federal Income Gift and Estate Taxation § 14.01A.

The Tax Court believed that the only restrictions it could consider in determining when the funds were made available were those contained in the trust indenture itself. However, it cited no precedent for this "four corners" theory, and our research discloses that limitations outside written agreements have been construed by other courts to preclude constructive receipt of income.

In Estate of Berry, 44 B.T.A. 1254 (1941), the Board of Tax Appeals found that taxpayer's estate was liable for income from the Sears Roebuck profit sharing plan. Berry had participated in the plan during the last twenty years of his life. His estate argued that, although decedent had not reported any income from the plan while alive, the funds should not be subject to tax in the year of his death because they had previously been made available to him under the provisions of the plan. The Board of Tax Appeals disagreed. In answer to the tax-

4. The Tax Court opinion is reported at 44 T.C. 623 (1965).

5. 26 U.S.C. § 402(a)(1), reads:
   (a) *Taxability of beneficiary of exempt trust.—*
   (1) *General rule.*—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust described in section 401 (a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities). The amount actually distributed or made available to any distributee shall not include net unrealized appreciation in securities of the employer corporation attributable to the amount contributed by the employee. Such net unrealized appreciation and the resulting adjustments to basis of such securities shall be determined in accordance with regulations prescribed by the Secretary or his delegate.

payer's argument that he could have made partial withdrawals without any penalty under the plan, the Board reasoned that partial removal would have reduced taxpayer's financial advantage from participation in the fund. This wholly economic consideration was sufficient to permit a finding that no money had previously been made available.

Several cases have considered situations in which the payor is in a distressed financial condition. When payment became difficult or impossible, and the payee agreed not to cash the debtor's check, there was no constructive receipt of income, even though legally the money was due and owing. Fischer, 14 T.C. 792, 801–802 (1949). An agreement among officers barring any of them from presenting their checks for payment because of such weak financial condition was also sufficient to put off recognition of income from one year to the next. Johnson, 25 T.C. 499 (1955). *See also,* Rhombar Co., Inc., 47 T.C. 75 (1966), aff'd., 386 F.2d 510 (2d Cir. 1967).

Finally, in Gann, 31 T.C. 211 (1958), an author was permitted to delay recognition of royalty income from one book after he signed a second contract requiring his publisher to pay him a certain sum for a later book before he would receive any income from the earlier one.

■ Collectively, these cases illustrate the principle that a substantial restriction denying constructive receipt of income need not be found within the four corners of the original legal instrument which originally conveyed the funds. The Tax Court in this case should therefore have considered the effect of the waiver agreements on the ability of the appellants to gain control over their shares in the fund.

Such an assessment would have found that these waiver agreements clearly prevented the signatories from receiving distribution. The Tax Court found that such a limitation was irrelevant because it looked solely at the question of whether a property right had accrued. However, the accrual of property rights is not at stake in this case. The participants in the profit sharing plan had at least an equitable property interest in their share of the fund from the day Wilkata put the money in the trust account. The shares were nonforfeitable, and this particular indenture provides that on termination of employment or death at any time after commencement of participation in the plan, an employee's share will be distributed to him or his heirs.[6] After five years in this plan, it is not a property right which accrues to the taxpayer-employees; it is the right to have their property distributed to them. The Commissioner concedes that there is no tax liability prior to five years participation. The optional withdrawal provision which he considers critical in the determination of this case does not change the property rights involved; it merely defines when a right to distribution accrues.

■ Therefore, we believe that the term "made available" as used in Section 402(a)(1) must be addressed to the question of when a right to distribution, as distinguished from a bare property right, accrues. If there is a substantial limitation on a right to distribution, arising from the indenture agreement itself, from other agreements, or from economic conditions analogous to those that defeat constructive receipt under the more general provisions of Section 451, then income cannot be held recognized during the existence of the limitation. Treas. Reg. 1.451–2.

■ The only question remaining is whether the private, multilateral waiver agreements at issue in this case were a sufficient restraint on the right of distribution to meet this test. We believe they were.

The agreements in this case were among seven and then six employee-officers of Wilkata. They owned a substan-

---

6. Article VI, Section 2, paragraphs (c) and (d), of the Wilkata Folding Box Company Trust Agreement of July 24, 1950.

tial proportion of the assets of the fund. They had significant reasons for signing the agreement: they wanted to continue to avoid tax liability over the period; and they wanted Ives to be assured of sufficient funds for his extremely successful investment program. It is unlikely that all the signers of the agreements could ever have been persuaded that both reasons were no longer valid. Therefore, abrogating the waivers would have been impossible. In effect, the five-year waivers were practically irrevocable.

The waiver agreement was not only permanent in character, but also iron-clad in its prohibition. The decision of the New Jersey Chancery Court construed the agreement as an absolute bar against any of the signers of the 1956 waiver receiving anything from the trust fund until 1962. It left no possible loopholes for any of the appellants to avoid the consequences of the agreement.

In this respect, the agreements are distinguishable from self-serving efforts of two or three taxpayers who might make similar waiver agreements solely for tax avoidance purposes. Such contracts would be considerably less permanent than the agreement before us. They might be altered at the whim of the taxpayers as their fortunes ebbed and flowed. The agreement here was for five years; it was signed by persons with participation rights in two-thirds of the fund; no individual signer had the right to revoke his waiver.

Furthermore, the particular situation in this case makes clear appellants' intent to have a definite postponement of their withdrawal rights. When the agreement was signed in 1950, the appellants and the trustee were under the impression that the five year optional withdrawal would not create any adverse tax consequences for the participants in the plan. The Internal Revenue Service gave no indication of changing the principles set down in *Berry* until 1954, when the first of the troublesome revenue rulings concerning recognition under deferred income plans was announced. The appellants attempted to change their rights under the agreement not because of a tactical desire to avoid taxes they had always known would be due, but because of what they feared might be a change in the applicable law.

As such, we find that the waiver agreements were of sufficient permanence and scope to be a substantial impediment to appellants' right to withdraw their shares from Wilkata's profit sharing plan. Therefore, during the life of the waiver agreements, no funds from the plan were made available to any of the appellants within the contemplation of Section 402(a)(1) of the Internal Revenue Code.

The decision of the Tax Court will be reversed.